## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:_____

_____

**RICHARD M. MOSS**, an individual; **IVAN T. KRUGLAK**, an individual; **ANN S. KRUGLAK**, an individual; **THE NATACHA KRUGLAK FAMILY TRUST**, a California trust, by and through its trustee,

      Plaintiffs,

v.

**DOUGLAS H. LIEN**, an individual; **CAMILLA R. LIEN**, an individual; **LYDIA M. LIEN A/K/A LYDIA LIEN-BUTLER**, an individual; and **LIEN WESTEND INVESTMENTS**, a New Mexico partnership,

      Defendants.

_____

### COMPLAINT AND JURY DEMAND

_____

      Plaintiffs, Richard M. Moss, Ivan T. Kruglak, Ann S. Kruglak, and The Natacha Kruglak Family Trust, by and through its trustee (collectively the "Plaintiffs"), through their counsel, GERSH & THOMAIDIS, LLC, state the following claims against Defendants, Douglas H. Lien, Camilla R. Lien, Lydia M. Lien a/k/a Lydia Lien-Butler and Lien Westend Investments (collectively the "Defendants"), averring in Plaintiffs' Complaint and Jury Demand (collectively the "Complaint"), as follows:

### I.  THE PARTIES

      1.    Plaintiff, Richard M. Moss ("Dr. Moss"), is an individual residing in the State of Colorado, at 3362 Sentinel Drive, Boulder, Colorado.

2.      Plaintiff, Ivan T. Kruglak ("Mr. Kruglak"), is an individual residing in the State of Colorado, at 1077 Carriage Hills Drive, Boulder, Colorado.

3.      Plaintiff, Ann S. Kruglak, ("Mrs. Kruglak"), is an individual residing in the State of Colorado, at 1077 Carriage Hills Drive, Boulder, Colorado.

4.      Mr. Kruglak and Mrs. Kruglak (the "Kruglaks") are husband and wife.

5.      Plaintiff, The Natacha Kruglak Family Trust (the "Trust"), is a California trust, in which Mr. Kruglak is the trustee of the Trust.  Mr. Kruglak is a resident of the State of Colorado, residing at 1077 Carriage Hills Drive, Boulder, Colorado.

6.      Defendant, Douglas H. Lien ("Mr. Lien"), is an individual residing in the State of New Mexico, at 37 Camino Tetzcoco, Santa Fe, New Mexico.

7.      Defendant, Camilla R. Lien ("Mrs. Lien"), is an individual residing in the State of New Mexico, at 37 Camino Tetzcoco, Santa Fe, New Mexico.

8.      Mr. Lien and Mrs. Lien (the "Liens") are husband and wife.

9.      Defendant, Lydia M. Lien a/k/a Lydia Lien-Butler ("Ms. Lien-Butler") is an individual residing in the State of Montana, at 2442 Milkhouse Avenue, Bozeman, Montana.

10.     Ms. Lien-Butler is the daughter of Defendants, Mr. Lien and Mrs. Lien.

11.     Defendant, Lien Westend Investments, a/k/a Westend Investments, a/k/a Westend Santa Fe, a/k/a Westend Trading ("Westend Trading") is, upon information and belief, a partnership pursuant to Colo. Rev. Stat. 7-60-101 *et seq*. and Colo. Rev. Stat. 7-64-101 *et seq*., and also NM. Stat. Ann. 54-1A-101 *et seq*.

12.     Upon information and belief, Westend Trading is, and was at all relevant times to this Complaint, a partnership among Defendants, Mr. Lien, Mrs. Lien and Ms. Lien-Butler,

operating in the State of New Mexico and conducting business at 37 Camino Tetzcoco, Santa Fe, New Mexico.

## II.   JURISDICTION AND VENUE

13.     Plaintiffs incorporate each and every allegation set forth above in their entirety, as if set forth herein.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.   As described in greater detail herein, the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is a controversy between citizens of different states.

15.     This Court has personal jurisdiction pursuant to Fed. R. Civ. P. 4(k) and C.R.S. § 13-1-124, because Defendants have substantial contacts with and have transacted business within the State of Colorado and engaged in wrongdoing, including contract breaches, statutory violations and tortious acts, within the State of Colorado and that impacted the State of Colorado.

16.     This Court is the proper venue pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims in the Complaint occurred within the judicial district of the United States District Court for the District of Colorado and each Defendant, through their conduct, have significant contacts with this judicial district.

## III.   STATEMENT OF FACTUAL BACKGROUND

17.     Plaintiffs incorporate each and every allegation set forth above in their entirety, as if set forth herein.

### i   The Plaintiffs

18.     Plaintiff, Dr. Moss, is a former physician.   Dr. Moss is presently employed as a consultant and counselor.

19.     During the relevant time period, Dr. Moss had limited experience in investing and in investments and relied on Defendants to adhere to their obligations, observe their duties and provide candid and truthful investment advice.

20.     Plaintiff, Mr. Kruglak is an electrical engineer and businessman.  Mr. Kruglak has professional experience that he currently applies in a variety of electronics businesses.

21.     During the relevant time period, Mr. Kruglak had limited experience in investing and in investments and relied on Defendants to adhere to their obligations, observe their duties and provide candid and truthful investment advice.

22.     Prior to retiring, Plaintiff, Mrs. Kruglak, was an instructor, programmer and systems analyst in the technology industry.  She is now an artist, creating polymer clay art.

23.     Mrs. Kruglak, during the relevant time period, had limited experience in investing and in investments and relied on Defendants to adhere to their obligations, observe their duties and provide candid and truthful investment advice.

24.     Plaintiff, the Trust, is an irrevocable trust for the benefit of the family members of Mr. Kruglak's now deceased first wife, Natacha Kruglak.

25.     During the time period relevant to the Complaint, in carrying out his duties as Trustee of the Trust, Mr. Kruglak had limited experience in investing on behalf of the Trust and he and the beneficiaries under the Trust relied on Defendants to adhere to their obligations, observe their duties and provide candid and truthful investment advice.

**ii**     ***The Defendants and an Overview of Defendants' Scheme***

26.     Prior to settling in Santa Fe, New Mexico, the Liens resided in the State of Colorado, at 316 North Thomas Road, Carbondale, Colorado.

27.     Upon information and belief, after Mr. Lien and Mrs. Lien incurred a variety of debts in Colorado, and had a number of judgments enter against one or both by a variety of creditors, including Alpine Bank Aspen, Colorado National Bank and Basalt West Plumbing and Heating, they left Colorado and relocated to New Mexico.

28.     After relocating to New Mexico, the Liens took up residence in a modest home, located at 37 Camino Tetzcoco, in Santa Fe.

29.     The Liens' daughter, Ms. Lien-Butler, is an Investment Adviser Representative, presently employed by Northfork Financial, LLC, in Bozeman, Montana.

30.     Ms. Lien-Butler worked at various companies in the financial services industry, including Prudential Securities, Morgan Stanley, Cowen & Co, Smith Barney and Intervest International, in addition to engaging in several other business ventures.

31.     Upon information and belief, Mr. Lien, Mrs. Lien and Ms. Lien-Butler created Westend Trading, as a partnership, doing business at the Liens' Camino Tetzcoco residence.

32.     Upon information and belief, Westend Trading was created for the purpose of running a business in which Defendants would obtain discretionary authority over investment funds solicited from clients and exercise total control over how the funds were used.

33.     Upon information and belief, Westend Trading was created as the vehicle for which Defendants represented to prospective and actual clients that they would provide investment advisory services and dispense investment advice.

34.     In furtherance of Defendants' objectives, Mr. Lien and Mrs. Lien cultivated a far-reaching network of social relationships, friends and acquaintances, including with Plaintiffs in Colorado, which they used to identify victims and then induce them to become clients of

Defendants' investment advisory business.

35.    In furtherance of Defendants' objectives, the Liens regularly traveled to Colorado and hosted guests in Santa Fe, New Mexico, ostensibly for social purposes-- but also to induce those acquaintances to become clients of Defendants' investment advisory business.

36.    In furtherance of Defendants' objectives, Mr. Lien told Plaintiffs, and upon information and belief other individuals that the Liens met through their network of social relationships, that he was a retired officer and banker with the Bank of New England, in Boston.

37.    In furtherance of Defendants' objectives, Mr. Lien told Plaintiffs, and upon information and belief other individuals that Mr. Lien and Mrs. Lien met through their network of social relationships, that he was a securities day trader with the Bank of New England.

38.    In furtherance of Defendants' objectives, Mr. Lien told Plaintiffs, and upon information and belief other individuals that the Liens met through their network of social relationships, that he was experienced in trading in futures, currencies and Treasury Bonds.

39.    In furtherance of Defendants' objectives, Mrs. Lien told Plaintiffs, and upon information and belief other individuals that Mr. Lien and Mrs. Lien met through their network of social relationships, that she was an artist, with extensive connections in the art community.

40.    In furtherance of Defendants' objectives and in seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mr. Lien advised them that Westend Trading was profitably investing for clients in short-term trades of U.S. Government Treasury Bonds, among other investments.

41.    In furtherance of Defendants' business objectives and in seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment

advisory business, Mr. Lien explained, in presentations using charts and graphs, how Westend Trading's clients' investments were managed and how trades were made.

42.     In seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mr. Lien advised them that all clients' investments with Westend Trading were completely liquid.

43.     In seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mr. Lien explained that Defendants used a process in which incremental "profits" were made for clients by buying and selling instruments like Treasury Bonds and futures contracts on those instruments, on a daily basis.

44.     In seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mr. Lien explained that he made multiple trades in the Treasury Bond market, often minute by minute, describing how he sat for hours each day, starting early in the morning when the market opened in Chicago.

45.     In seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mrs. Lien validated Mr. Lien's trading activities, advising that he would sit for hours each day pressing keys at his computer.

46.     In seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mr. Lien advised them that Westend Trading was providing "an average and conservative 10%" annual return on money invested, while referencing other people, who Plaintiffs were acquainted with, who had invested.

47.     In seeking for Plaintiffs, and upon information and belief other individuals, to become clients of Defendants' investment advisory business, Mr. Lien advised them that, based

on his high level of experience, he had been historically able to produce a return on the money investors invested of between 8% and 15% annually.

48.     In seeking for Plaintiffs, and upon information and belief other individuals, to become or remain clients of Defendants' investment advisory business, Mr. Lien advised them that trades were made through a Brokerage in Chicago, Illinois, R.J. O'Brien & Associates, LLC ("R.J. O'Brien").

49.     In seeking for Plaintiffs, and upon information and belief other individuals, to become or remain clients of Defendants' investment advisory business, Mr. Lien advised them that each client's funds are held in a separate account with R.J. O'Brien, but traded in a "master account" with the same.

50.     In seeking for Plaintiffs, and upon information and belief other individuals, to become or remain clients of Defendants' investment advisory business, Mr. Lien advised that if there were ever a stock market collapse or other catastrophic event, each client's funds were safely deposited in a money market-type account when not being used for trading.

51.     In seeking for Plaintiffs, and upon information and belief other individuals, to become or remain clients of Defendants' investment advisory business, Mr. Lien advised them that Defendants' approach was "to stay very short-term, very liquid and very careful."

52.     The foregoing representations reassured potential and actual investors, including Plaintiffs, of the processes Defendants claimed to employ and the safety of the investment funds entrusted by clients to Defendants' custody and control.

53.     As time progressed, in response to certain concerns by Plaintiffs and in an effort to provide additional assurances and induce them into making additional investments in Defendants'

investment advisory business, Mr. Lien and Mrs. Lien advised that they were creating "life insurance trusts" for Plaintiffs, consisting of life insurance policies on the lives of Mr. Lien, or alternatively Mr. Lien and Mrs. Lien, where Plaintiffs would be beneficiaries in the event of these Defendants' death.

54.     In an effort to provide additional assurances to Plaintiffs and induce them into making additional investments in Defendants' investment advisory business, Mr. Lien promised Plaintiffs that the beneficiary designations on the foregoing life insurance policies would, upon death, result in those policies paying out proceeds to Plaintiffs "almost immediately."

55.      In an effort to provide additional assurances to Plaintiffs and induce them into making additional investments in Defendants' investment advisory business, Mr. Lien promised that the beneficiary designations on the foregoing life insurance policies "exist completely outside" the Liens' estates and would have nothing to do with Defendants' other assets.

56.     Upon information and belief, the representations made in Paragraphs 36 through 51, above, in Paragraphs 53 through 55, above, were false.

57.     In soliciting investments from Plaintiffs, and upon information and belief other individuals, Defendants requested the client wire their investment funds into a personal account, including one in the name of "Douglas Lien/Westend Trading," at J.P. Morgan Chase Bank, Account Number XXX XXX 968, in Denver, Colorado.

58.     Once a client's investment funds were secured in Defendants' personal account, Defendants had unfettered access to the subject funds-- and unrestrained and unregulated discretion to use those funds how they wished.

59.     Once a client's investment funds were secured within one of Defendants' personal

accounts, Mr. Lien would advise the client that the subject funds had been added to the client's personal account for trading but, upon information and belief, Defendants did not use those funds as represented and instead the funds were converted for Defendants' personal use.

60.     Once a client-investor's investment funds were secured in Defendants' personal account, upon information and belief, Defendants used those funds to pay prior client-investors in Defendants' investment advisory business, among other things.

61.     Between at least December 2011 and the present, Defendants, individually and doing business as Westend Trading, accepted funds from Plaintiffs, and other parties cultivated through their network of social relationships, by fraudulently telling them they would invest and trade their investment funds and safely hold those investment funds in individual accounts.

62.     Between at least December 2011 and the present, Defendants issued to their clients both periodic account statements and annual tax forms, almost always demonstrating a profit, but which were falsified.

63.     During the relevant timeframe, no Defendant was properly registered as an Investment Adviser Representative in Colorado or in New Mexico, or was properly licensed as a Broker with the Financial Industry Regulatory Authority ("FINRA").

64.     During the relevant timeframe, Defendants effectively avoided any registration with any regulatory agency and avoided any regulatory oversight.

65.     As set forth in additional detail herein, as a direct and proximate result of Defendants' scheme, and failure to adhere to their obligations, observe their duties and provide candid and truthful investment advice, Plaintiffs invested and have now lost substantially all of their investment funds, which they invested with Defendants-- in excess of $2,000,000.00.

### iii      *Background and Plaintiffs' Investments with Defendants*

66.     In 2011, Dr. Moss spoke with third-parties, Ms. Candace Resnick ("Ms. Resnick") and Ms. Annalisa Mather ("Ms. Mather"), and learned each had invested money with Mr. Lien and that another mutual acquaintance was "amazed at how much money he is making."

67.     Dr. Moss expressed an interest to Ms. Resnick and Ms. Mather in investing with Mr. Lien, seeking an introduction to Mr. Lien through Ms. Mather.

68.     In at least two subsequent telephone calls between Dr. Moss and Mr. Lien in May and June 2011, Mr. Lien told Dr. Moss that he was an experienced investor who began by helping a friend and then subsequently began to offer investment services for a "few people."

69.     In the telephone call between Dr. Moss and Mr. Lien, Mr. Lien advised that he has a limit of 15 investor clients maximum, which, Mr. Lien said, is the maximum number of investors he could have without going through an elaborate registration process with securities regulating bodies in order to sell securities.

70.     In this telephone call between Dr. Moss and Mr. Lien, Mr. Lien indicated that he was open to taking Dr. Moss on as a client "once a spot opens."

71.     Later in 2011, Mr. Lien advised Dr. Moss that he had been "accepted" to make investments in Defendants' investment advisory business.

72.     Prior to investing, Dr. Moss met with Mr. Lien, in-person, on or about October 13, 2011, when Mr. Lien gave Dr. Moss a presentation on Defendants' investment advisory business and investment strategy, using a variety of charts and graphs and explaining how investments were made with Defendants and how trading was conducted with clients' funds.

73.     At the meeting on or about October 13, 2011, Mr. Lien advised Dr. Moss of the

particulars of Defendants' investment advisory business and strategy, including the representations made in Paragraphs 36 through 51, above, stating that he had historically been making a return of 10-15% yearly and that client funds were safe and never left in a vulnerable position in the event of volatility or a market collapse.

74.    Acting in reliance upon Mr. Lien's representations, Dr. Moss signed a "Letter of Agreement" and was later provided with a supplemental "Letter of Agreement," dated December 28, 2011 (the "Moss Contract"), memorializing Dr. Moss's relationship with Defendants.  A true and correct copy of the Moss Contract is attached as **Exhibit 1**.

75.    The Moss Contract directs that it "…will govern the management of [Dr. Moss's] account" and confirms receipt of "…equity of $191,500.55." (*See* **Ex. 1**, at p. 1, ‖ 1).

76.    Under the terms of the Moss Contract, equity will be "…held in your name and for your benefit and it will be traded, invested and managed within the general guidelines that we have discussed" and "…resulting income from this equity is generated each month, this income will be added to the initial equity" and "…losses would be subtracted from that equity." (*Id*.).

77.    Under the Moss Contract's terms, the "…fee will be 15% of the trading profit each month and the trading profit of each succeeding month" and "[t]he net profit-- after broker's commissions and my fee-- will be added to your equity each month." (*Id*., at p. 1, ‖ 2).

78.    The Moss Contract defines "trading profit" as "…the profit after broker's commissions have been deducted." (*Id*.).

79.    Under the Moss Contract's terms, if Dr. Moss decides "…to withdraw any funds from the current equity position, they will be available 5 business days after you request them." (*Id*., at p. 1, ‖ 3).

80.     Under the Moss Contract's terms, if anything incapacitates Mr. Lien from managing Dr. Moss's account, either Mr. Lien or Mrs. Lien "…will send the current amount of equity and accrued income by cashier's check or bank wire to your account at whatever bank you choose." (*Id.*, at p. 1, ℙ 5).

81.     In a later attachment to the Moss Contract's terms, dated December 8, 2015, titled "This is a draft copy to replace Paragraph 5 in our Letter of Agreement," Defendants sought to modify the section of the Moss Contract to indicate, in the event of Mr. Lien's death:

> …upon submission of your last Statement and further notation as to accrued income since that statement
>
> **************************** <u>Life Insurance Company **</u>
>
> will send the current amount of equity and that accrued income by cashier's check or bank wire to you:
> **as beneficiary** ----   to your account at whatever bank you choose or to your above stated address…
>
> ** When issued, a copy of this policy will be forwarded to you for your records and safekeeping.

(*Id.*, at p. 4) (*emphasis in original*).

82.     Under the Moss Contract's terms, absent a "new and succeeding agreement," the contract may be "discontinued" only on "90 days (*sic*) notice and upon payment to you of all the equity and accrued income in your account." (*Id.*, at p. 2, ℙ 7- ℙ 8).

83.     In or about June 2012, acting in reliance on Defendants' representations about their investment advisory business, Dr. Moss first invested, investing an initial amount of $100,000.00 in an account Defendants said was designated the "RM Personal Savings" account.

84.     In July 2012, Dr. Moss invested an additional $130,008.00 in an account Defendants said was designated the "Moss PSP Retirement Fund" account.

85.     Dr. Moss specifically requested that the foregoing funds be held in a different account than RM Personal Savings for tax purposes and Dr. Moss understood a second account was opened by Defendants with the R.J. O'Brien for this purpose.

86.     Initially, Dr. Moss received information from Mr. Lien regarding the RM Personal Savings account and statements directly from R.J. O'Brien for the Moss PSP Retirement Fund account.

87.     By November 2012, Dr. Moss noticed limited activity and losses in the Moss PSP Retirement Fund account statements from R.J. O'Brien, while the RM Personal Savings account was realizing gains in information provided by Defendants, and contacted Mr. Lien by telephone to inquire about the differences in the reported rates of return.

88.     Mr. Lien informed Dr. Moss that because Defendants' trades are generally made by way of Defendants' "master account" and the Moss PSP Retirement Fund account is separate, he was unable to achieve the same results for the account.

89.     Taking Mr. Lien at his word and relying on his representations, Dr. Moss asked whether it would be possible to open an account that would permit Defendants to trade the Moss PSP Retirement Fund account funds by way of Defendants' "master account."

90.     On this November 2012 telephone call, Mr. Lien informed Dr. Moss that it was possible to trade the Moss PSP Retirement Fund account funds like the RM Personal Savings account, by way of Defendants' "master account" used in trading.

91.     Upon information and belief, on or about November 13, 2012, Mr. Lien closed the Moss PSP Retirement Fund account held by R.J. O'Brien and transferred Dr. Moss's funds into an account designated as the "Richard Moss PSP Fund B," held internally with Defendants.

92.     Subsequent to November 2012, Dr. Moss stopped receiving monthly statements from R.J. O'Brien and began receiving statements from Defendants showing two separate accounts, the "Richard Moss Personal Fund A" and the "Richard Moss PSP Fund B," which were realizing substantially the same returns based on the information provided by Defendants.

93.     Among others, on October 4, 2013, Mr. Lien sought and received $15,000.00 in additional investment funds from Dr. Moss, which Defendants received into the personal account with J.P. Morgan Chase Bank, Account Number XXX XXX 968.

94.     Subsequently, Mr. Lien repeatedly assured Dr. Moss that his accounts, which Defendants cite by various names, including "Account A" for the RM Personal Savings account and "Account B" for the Richard Moss PSP Fund account, are maintained as separate accounts.

95.     Mr. Lien repeatedly assures Dr. Moss that, as additional funds are invested with Defendants, the funds are placed in the appropriate account and that Defendants would be "working with" the funds or the funds would be "working for" Dr. Moss shortly thereafter.

96.     Often, Mr. Lien would offer "updates" on Dr. Moss's investments, for example in an e-mail dated May 26, 2014, where Mr. Lien advised that the accounts "have done very well" and the "funds are off to a fine start for the year" and, in an e-mail dated July 30, 2014, where Mr. Lien indicated "[a]ll told, very good compared to other returns in today's market place."

97.     In late-2014, the Kruglaks spoke with Dr. Moss and third-party, Ms. Mather, and, in doing so, learned that both had invested money with Mr. Lien and the other Defendants.

98.     The Kruglaks, after hearing about the successes these clients of Defendants' investment advisory business believed they were receiving, also expressed an interest investing with Defendants.

99.     On November 16, 2014, Dr. Moss e-mailed Mr. Kruglak, passing on Mr. Lien's e-mail address-- lien@westendsantafe.com and advising Mr. Kruglak that Mr. Lien had said that Westend Trading had an opening for a client, to be filled on a "first come, first served" basis.

100.     On two subsequent occasions, including on or about November 23, 2014, the Kruglaks spoke to Mr. Lien by telephone, in which Mr. Lien advised them that he was an experienced investor who began by helping a friend and then subsequently began to offer investment services for a "few people."

101.     In the telephone calls between the Kruglaks and Mr. Lien, Mr. Lien said that he has a limit of 15 investor clients maximum, which he again indicated is the maximum number of investors Defendants could have without registering to sell securities.

102.     In this telephone call on November 23, 2014, Mr. Lien advised the Kruglaks of Defendants' investment advisory business and investment strategy, including the representations made in Paragraphs 36 through 51, above, emphasizing that he obtains a return of 10% to 12% annually and, if the Kruglaks establish an account with Defendants, it would enable them to have a much better idea of how the funds would operate and perform.

103.     Subsequently, on November 23, 2014, Mr. Lien e-mailed Mr. Kruglak a draft Letter of Agreement and an addendum, which included a pro forma and what Defendants indicated was a "typical" month's statement.

104.     On November 24, 2014, Mr. Lien provided Mr. Kruglak with wire transfer instructions, including the account and routing for the personal account with J.P. Morgan Chase Bank, Account Number XXX XXX 968.

105.     In another telephone call on or about November 26, 2014, Mr. Lien advised Mr.

Kruglak further on Defendants' investment advisory business, including reiterating the representations made previously.

106.    On or about December 2, 2014, the Kruglaks invested $400,000.00 with Defendants, which Douglas Lien requested and received into the personal account with J. P. Morgan Chase Bank, indicating that Defendants would start "working with it" tomorrow.

107.    On or about December 10, 2014, the Kruglaks signed a "Letter of Agreement," dated November 28, 2014 (the "First Kruglak Contract"), in which Defendants memorialized the relationship of their clients as "Ivan Kruglak & Ann Kruglak as Tenants in Common."  A true and correct copy of the First Kruglak Contract is attached as **Exhibit 2**.

108.    The First Kruglak Contract directs that it "…will govern the management of [the Kruglaks'] account" and confirms receipt of "…equity of $400,000," consistent with the Kruglaks' investment of $400,000.00, on or about December 2, 2014. (*See* **Ex. 2**, at p. 1, ¶ 1).

109.    Under the First Kruglak Contract, the Kruglaks' equity will be "…held for your benefit and it will be traded, invested and managed within the general guidelines that we have discussed" and "…resulting income from this equity is generated each month, this income will be added to the initial equity" and "…losses would be subtracted from that equity.." (*Id.*).

110.    Under the terms of the First Kruglak Contract, the "…fee will be 15% of the trading profit each month and the trading profit of each succeeding month" and "[t]he net profit <u>after</u> broker's commissions and my fee will be added to your equity each month." (*Id.*, at p. 1, ¶ 2) (*emphasis in original*).

111.    The First Kruglak Contract defines "trading profit" as "…the profit after broker's commissions have been deducted." (*Id.*).

112.    Under the First Kruglak Contract's terms, if the Kruglaks decide "…to withdraw any funds from the current equity position, they will be available 5 business days after you request them." (*Id*., at p. 2, ⁋ 3).

113.    Under the First Kruglak Contract's terms, if anything incapacitates Mr. Lien from managing the Kruglaks' account, either Mr. Lien or Mrs. Lien "…will send the current amount of equity and accrued income by cashier's check or bank wire to your account at whatever bank you choose." (*Id*., at p. 2, ⁋ 5).

114.    Under the First Kruglak Contract's terms, in the event of Mr. Lien's and Mrs. Lien's death, "…either my daughter, Lydia Maynard Lien, as my agent or our Trustee, J.M. Forbes & Co.; Boston, Mass. will send the current amount of equity and accrued income by cashier's check or bank wire to your account at whatever bank you choose." (*Id*.).

115.    As a later attachment to the First Kruglak Contract's terms, dated December 8, 2015 and titled "This is a draft copy to replace Paragraph 5 in our Letter of Agreement," Defendants sought to modify the section of the First Kruglak Contract to indicate, in the event of Mr. Lien's and Mrs. Lien's death:

> …upon submission of your last Statement and further notation as to accrued income since that statement
>
> ****************************  <u>Life Insurance Company</u> **
>
> will send the current amount of equity and that accrued income by cashier's check or bank wire to you:
> **as beneficiary**  ----   to your account at whatever bank you choose or to your above stated address…
>
> ** When issued, a copy of this policy will be forwarded to you for your records and safekeeping.

(*Id*., at p. 4) (*emphasis in original*).

116.    Under the terms of the First Kruglak Contract, absent a "new and succeeding agreement," the contract may be "discontinued" only on "90 days (*sic*) notice upon payment to you of all the equity and accrued income in your account." (*Id*., at p. 3, ⁋ 7- ⁋ 8).

117.    Acting in reliance on Defendants' representations about their investment advisory business, the Kruglaks first invested, investing an initial amount of $400,000.00 in an account Defendants said was designated the "Ivan Kruglak and Ann Kruglak Fund" account.

118.    As with Dr. Moss, Mr. Lien would offer frequent "updates" on the Kruglaks' investment, for example in an e-mail dated March 1, 2015, where Mr. Lien advised that "we are off to a very good start" and, in an e-mail dated May 19, 2015, where Mr. Lien indicated "…income continues very much on track."

119.    Subsequently, on or about July 3, 2015, acting in reliance on Defendants' representations about clients' investments, the Kruglaks invested an additional $250,000.00, which Mr. Lien indicated would be placed in a second account with Defendants.

120.    On or about July 17, 2015, the Kruglaks signed a second "Letter of Agreement" (the "Second Kruglak Contract"), in which Defendants documented a second account as being for "Ann Kruglak, as Tenants in Common," but which was changed to "Ann Kruglak *and Ivan Kruglak*, as Tenants in Common.  A true and correct copy of the Second Kruglak Contract is attached as **Exhibit 3**.

121.    The Second Kruglak Contract directs that it "…is a <u>Letter of Agreement</u> that will govern the management of [the Kruglaks'] account" and confirms receipt "…[a]s of July 3, 2015…with equity of $250,000." (*See* **Ex. 3**, at p. 1, ⁋ 1) (*emphasis in original*).

122.    In the Second Kruglak Contract, the Kruglaks' equity will be "…held for your

benefit and it will be traded, invested and managed within the general guidelines that we have discussed" and "…resulting income from this equity is generated each month, this income will be added to the initial equity" and "…losses would be subtracted from that equity.." (*Id.*).

123.    Under the Second Kruglak Contract's terms, the "…fee will be 15% of the trading profit of each succeeding month" and "[t]he net profit <u>after</u> broker's commissions and my fee will be added to your equity each month." (*Id.*, at p. 1, ℙ 2) (*emphasis in original*).

124.    The Second Kruglak Contract defines "trading profit" as "…the profit after broker's commissions have been deducted." (*Id.*).

125.    Under the Second Kruglak Contract's terms, if the Kruglaks decide "…to withdraw any funds from the current equity position, they will be available 5 business days after you request them." (*Id.*, at p. 1, ℙ 3).

126.    Under the Second Kruglak Contract's terms, if anything incapacitates Mr. Lien from managing the Kruglaks' account, either Mr. Lien or Mrs. Lien "…will send the current amount of equity and accrued income by cashier's check or bank wire to your account at whatever bank you choose." (*Id.*, at p. 2, ℙ 5).

127.    Under the Second Kruglak Contract's terms, in the event of Mr. Lien's and Mrs. Lien's death, "…either my daughter, Lydia Maynard Lien, as my agent or our Trustee, J.M. Forbes & Co.; Boston, Mass. will send the current amount of equity and accrued income by cashier's check or bank wire to your account at whatever bank you choose." (*Id.*).

128.    Under its terms, absent a "new and succeeding agreement," the Second Kruglak Contract may be "discontinued" only on "90 days (*sic*) notice upon payment to you of all the equity and accrued income in your account." (*Id.*, at p. 2, ℙ 7- ℙ 8).

129.     In early-June 2015, Mr. Kruglak e-mailed Mr. Lien and advised him that the corpus of the Trust, consisting of approximately $152,000.00, intended for three of Mr. Kruglak's first wife's relatives and one friend, was making about 3% annually in a mutual fund and inquiring whether Defendants could invest the corpus on behalf of the Trust.

130.     On June 5, 2015, Mr. Lien responded by e-mail to Mr. Kruglak, advising that he could "do a bit better…let's say something comparable to the yield on your portfolio: 10%-11%."

131.     Acting in reliance on Defendants' representations about the Kruglaks' existing investments and promises of similar future returns, Mr. Kruglak, acting in his capacity as Trustee of the Trust, then wired $128,552.00 belonging to the Trust, to Defendants' personal account with J.P. Morgan Chase Bank.

132.     On June 29, 2015, Mr. Lien advised by e-mail that Defendants would prepare and send Mr. Kruglak a separate agreement letter in the name of the Trust, but Defendants never sent such an agreement for the Trust, as promised.

133.     In the June 29, 2015, e-mail, Mr. Lien promised Mr. Kruglak that the Trust funds, like the Kruglaks' other investments, would be held in a separate account for the Trust but traded within Defendants' "master account."

134.     Subsequent to June 2015, Mr. Kruglak received statements from Defendants showing three separate accounts, the "Ivan Kruglak and Ann Kruglak Fund," the "Ann Kruglak and Ivan Kruglak (as Tenants in Common) Fund" and the "Natasha Kruglak Fund," which Defendants claimed were separate but realizing substantially the same returns.

135.     While Mr. Kruglak, as Trustee of the Trust, never received a separate agreement letter from Defendants in the name of the Trust, given the statements regarding the Natasha

Kruglak Fund that he was receiving, Mr. Kruglak presumed that the Trust's investments were pursuant to the terms of the First Kruglak Contract and the Second Kruglak Contract.

136.    Defendants agreed to assume the management of investments on behalf of the Trust, and fiduciary obligations related to the same, pursuant to the terms of the First Kruglak Contract and the Second Kruglak Contract.

### iv    *Defendants Seek to Placate Plaintiffs and Secure More Money*

137.    In the course of Plaintiffs' relationship with Defendants, concerns began to arise about Mr. Lien's advancing age impacting his trading activities and what would happen to Plaintiffs' investment funds should something happen to Mr. Lien.

138.    Mr. Lien frequently reassured Dr. Moss and the Kruglaks that Mrs. Lien would handle the disbursement of investors' funds in the event of his death or incapacitation or, in the alternative, Ms. Lien-Butler would handle the disbursement of investors' funds.

139.    In early-2016, Plaintiffs expressed additional concerns to Mr. Lien about what would happen to Plaintiffs' investment funds should something happen to Mr. Lien and Dr. Moss even advised Mr. Lien that he was considering removing some or all of his funds from Defendants' control.

140.    In response, Mr. Lien proposed that he would obtain life insurance policies, which would cover Plaintiffs' investment funds with Defendants, so that Plaintiffs could obtain additional assurances and payout of their investment funds in the event of Mr. Lien's death.

141.    In an e-mail to Mr. Kruglak on March 27, 2016, Mr. Lien advised them that a "Life Insurance Trust" for the Kruglaks and the Trust was "coming together," consisting of a life insurance policy on both Mr. Lien and Mrs. Lien.

142.    In the foregoing e-mail, Mr. Lien advised Mr. Kruglak that the subject life insurance policy will pay out almost immediately and that Mr. Kruglak, Mrs. Kruglak and Mr. Kruglak, as Trustee will be a beneficiary for the Natasha Kruglak Fund.

143.    In a similar e-mail to Dr. Moss on April 19, 2016, Mr. Lien advised him that "the life insurance option that we discussed…is by far the best back-up for your account in that it would provide an immediate guarantee of repayment completely apart from the usual time involved in any estate settlement questions."

144.    In an e-mail to Dr. Moss on June 23, 2016, Mr. Lien advised him that the life insurance policy naming Dr. Moss as beneficiary "is moving forward," and he further advised that he and Mrs. Lien "decided early on to do the policy on both" of them.

145.    In an e-mail to the Kruglaks on September 6, 2016, Mr. Lien advised them that a life insurance policy was issued for $1,500,000.00 on he and Mrs. Lien and that beneficiary designation forms, naming the Kruglaks as beneficiaries, would be executed the following day.

146.    In the foregoing e-mail, Mr. Lien advised the Kruglaks that the life insurance policy was in full force and effect as of September 1, 2016 and the Kruglaks' "inclusion" would occur when the forms naming them as the sole beneficiaries are executed and notarized.

147.    In the foregoing e-mail, Mr. Lien advised the Kruglaks that if they used the life insurance policy "to cover the exposure under the 2 main funds," meaning the Ivan Kruglak and Ann Kruglak Fund and the Ann Kruglak and Ivan Kruglak (as Tenants in Common) Fund, the insurance coverage "gives Ann an additional almost $250,000 back-up should you wish to increase her fund" with Defendants.

148.    In this e-mail, Mr. Lien also told the Kruglaks that a separate life insurance policy

has been issued naming Dr. Moss as beneficiary.

149.    On September 12, 2016, Mr. Lien sent an e-mail advising Dr. Moss that "an insurance policy" has "just been issued" for the Kruglaks and that he should have another insurance policy for Dr. Moss "this week or next" and would send the beneficiary designation to Dr. Moss as soon as he has it.

150.    It was not until October 12, 2016 that Defendants sent a letter to the Kruglaks, which advised of the issuance of a life insurance policy related to the Kruglaks' investments.

151.    In connection with the foregoing letter, Defendants provided the Kruglaks with what they claimed was a valid Change of Beneficiary form for Protective Life Insurance Company ("Protective"), Policy #PL0945569, showing Mr. Kruglak and Mrs. Kruglak designated as primary beneficiaries, bearing Mr. Lien's and Mrs. Lien's signatures and a date of September 15, 2016.

152.    Defendants indicated that the foregoing Change of Beneficiary form for Protective, Policy #PL0945569 was "the confirmation of your policy" and represented additional security for the Kruglaks' investments for up to $1,500,000.00.

153.    In the October 12, 2016 letter to the Kruglaks, Defendants indicated that, in the event of Mr. Lien's and Mrs. Lien's death, Protective, Policy #PL0945569 covered the Kruglaks' investments with Defendants, including investments by the Trust.

154.    In the October 12, 2016 letter to the Kruglaks, Defendants further indicated that Protective was "in the process of issuing" an additional life insurance policy for $1,000,000.00 of coverage and Defendants would send on the relevant beneficiary assignments and documentation to the Kruglaks, when received.

155.    On February 23, 2017, Mr. Lien advised Dr. Moss by e-mail that he intended to

"review the insurance beneficiary assignment, which he said that he had, and would send it to Dr. Moss "as back-up for your funds (in the same way I have done for the Kruglaks)."

156.    On July 20, 2017, Defendants finally corresponded with Dr. Moss, advising him that a life insurance policy had been issued in 2012 to cover a portion of his investment funds.

157.    In connection with the July 20, 2017 correspondence, Defendants advised Dr. Moss that he was named as the beneficiary on a 10-year term life insurance policy with Transamerica Life Insurance Company ("Transamerica"), Policy #43828720.

158.    Defendants indicated that Transamerica, Policy #43828720, was intended to give additional security for a portion of Dr. Moss's investments with Defendants, with a "death benefit of $500,000.00," covering a portion of Dr. Moss's investments with Defendants.

159.    Based upon the representations made by Defendants, including as set forth in modifications to the Moss Contract and the First Kruglak Contract, Dr. Moss and the Kruglaks believed they would receive additional security from Defendants related to their investments and, in the event of Mr. Lien's death, in the case of Dr. Moss, and Mr. Lien's and Mrs. Lien's death, in the case of the Kruglaks, each was designated as a beneficiary on a life insurance policy.

160.    On May 20, 2018, Mr. Lien advised Dr. Moss that he and Mrs. Lien were going to Naushon Island in Massachusetts, stating "we are leaving here this week and will move my office to Naushon as usual for the month of June."

161.    Over the course of Plaintiffs' relationship with Defendants, Defendants provided simple periodic statements, generally on a monthly basis, related to Plaintiffs' investments.

162.    The account statements Defendants issued to Plaintiffs, which demonstrated Defendants' claimed trading activity-- *always showed profits of 9.70% to 15.07% annually*.

163.    Some of Defendants' statements included commentary from Mr. Lien related to economic conditions, political climate and other current events, upon information and belief, in an effort to provide an additional element of credibility to Defendants' activities.

164.    Defendants' statements on funds invested by clients would include a beginning balance, an ending balance, and line items for "Gross Income," the "Management Fee" collected by Defendants, and for "Net Income to Equity," for each of Plaintiffs' accounts.

165.    While Defendants would occasionally provide Plaintiffs with late statements, correct a prior statement, or miss a statement altogether, subsequent statements appeared to account for missing timeframes or correct ostensible errors.

166.    While Defendants would occasionally demonstrate errors in bookkeeping, Mr. Lien would always promptly distribute funds to Plaintiffs, when requested and pursuant to the terms of the Contracts.

167.    Subsequent to the statements received directly from R.J. O'Brien for the Moss PSP Retirement Fund account ending in November 2012, Defendants' statements would not provide any indication of the accounts or the "master account" Defendants used at R.J. O'Brien, including omitting all details of account activity, transactions, and fees paid to R.J. O'Brien.

168.    Upon information and belief, if one or more Defendants had an account or accounts with R.J. O'Brien, those accounts were opened and maintained based on false statements, which affirmed that the funds in the subject accounts were Defendants' and traded at their discretion.

169.    Defendants provided Plaintiffs with hand-written Forms 1099-B for tax reporting purposes, generally stating the description of property as "Regulated Futures Contracts," with the date acquired and the date sold or disposed as "Various"-- *always showing a profit.*

170. Plaintiffs, including the Trust, relied on Defendants' hand-written Forms 1099-B for tax purposes, including in filing their state and federal income taxes.

171. Plaintiffs continued their investor relationship with Defendants, acting in reliance upon Defendants' representations, regarding: (a) Mr. Lien's qualifications and purported experience; (b) the safety and security of funds invested with Defendants; (c) Mrs. Lien's and Ms. Lien-Butler's affiliation as agents of Mr. Lien and Westend Trading; (d) Defendants' past investment performance and anticipated future performance; (e), the security of being beneficiaries on life insurance policies on Mr. Lien and/or Mrs. Lien; (f) Defendants' ability and intent to distribute investment funds when requested; (g) Defendants' false account statements and tax forms showing fictitious trading profits; and (h) assurances made by Mr. Lien and Mrs. Lien in the course of the parties' social relationships regarding the legitimacy of Defendants' investment advisory business and trading activities.

172. Acting in reliance on Defendants' representations, Dr. Moss invested a total of approximately $690,000.00 in Defendants' investment advisory business, in "Account A, the RM Personal Savings" account with Defendants and "Account B, the Richard Moss PSP Fund" account with Defendants, between June of 2012 and July of 2018.

173. Acting in reliance on Defendants' representations, Mr. Kruglak and Mrs. Kruglak invested a total of $1,400,000.00 in the "Ivan Kruglak and Ann Kruglak Fund" account with Defendants and $750,000.00 in the "Ann Kruglak and Ivan Kruglak (as Tenants in Common) Fund" account with Defendants, between December of 2014 and October of 2018.

174. Acting in reliance on Defendants' representations, Mr. Kruglak, acting in his capacity as Trustee of the Trust, invested approximately $130,000.00 in the "Natasha Kruglak

Fund" account with Defendants, in June of 2015.

### v  Plaintiffs Gradually Identify Defendants' Misrepresentations

175.    In late 2018, Dr. Moss learned that Mr. Lien had apparently developed a heart condition, requiring surgery to replace a valve.

176.    Dr. Moss contacted Mr. Lien inquiring about his medical condition but, acting in reliance on Defendants' representations that if anything were to incapacitate Mr. Lien, either Mrs. Lien or Ms. Lien-Butler, as agents of Mr. Lien and Westend Trading, would handle the distribution of equity and accrued income from a Plaintiff's investments, Dr. Moss elected to keep his investments with Defendants.

177.    Dr. Moss subsequently relayed the information regarding Mr. Lien's heart condition and surgery to the Kruglaks, who had been previously unaware of Mr. Lien's condition.

178.    In December 2018, Defendants began to fail to completely fulfill, or miss altogether, scheduled and requested distributions of funds to Plaintiffs, including the Trust.

179.    In December 2018, Defendants also stopped providing timely periodic statements to Plaintiffs regarding the status of Plaintiffs' accounts.

180.    In December 2018, Dr. Moss and the Kruglaks sought to contact Mr. Lien, in an effort to learn of the status of their investments, but Mr. Lien became increasingly non-responsive and, when Mr. Lien did respond, he provided only vague assurances that Plaintiffs' investments were safe.

181.    In January 2019, in an effort to understand Defendants' delay in distributions, failure to fully fund requested distributions, and lack of timely documentation, Dr. Moss and third-

party, Mrs. Kathy Fellows-Moss ("Mrs. Fellows-Moss"), travelled to Santa Fe, New Mexico to speak with Mr. Lien and Mrs. Lien directly.

182.   In preparation for the foregoing meeting, Dr Moss specifically requested that Defendants prepare their bookkeeping for review but, during this meeting, Mr. Lien failed to produce any of Defendants' bookkeeping regarding the status of clients' investments.

183.   During the meeting with Dr. Moss and Mrs. Fellows-Moss, Defendants refused to produce statements, including related to R.J. O'Brien, which identified the status of investment funds, as Mr. Lien claimed such disclosure could serve to violate the privacy of other investors.

184.   During the meeting with Dr. Moss and Mrs. Fellows-Moss, Mr. Lien indicated that Defendants' investors' money was pooled together into one account, but represented that each client had their own account within this account, despite refusing to produce any bookkeeping or statements to support such an assertion.

185.   In response to questions from Dr. Moss about Defendants' failure to remit the entire amount of a requested distribution requested in December 2018, Mr. Lien offered to go to Dr. Moss's bank and deposit an additional partial payment into Dr. Moss's account.

186.   Upon information and belief, in April of 2019, Ms. Resnick had monthly payments of $16,000.00, which she had been receiving from Defendants for more than 10 years, abruptly stop without explanation.

187.   Upon information and belief, in May of 2019, Ms. Resnick traveled to 37 Camino Tetzcoco, in Santa Fe, New Mexico, and inquired of Mr. Lien directly about the status of her investment funds with Defendants, requesting proof of her investment funds from R.J. O'Brien.

188.   Upon information and belief, in response to Ms. Resnick's request in May of 2019,

Mr. Lien advised that her investment with Defendants was safe, but subsequently refused to show her documentation from R.J. O'Brien, citing concerns about confidentiality.

189.     In May of 2019, increasingly alarmed about the safety of their investments with Defendants, Dr. Moss and the Kruglaks consulted with one another, and subsequently contacted Ms. Resnick, as she facilitated initial introductions to Mr. Lien and Mrs. Lien.

190.     In May of 2019, Ms. Resnick provided Dr. Moss and the Kruglaks with some additional information on the status of Defendants' investors' investments.

191.     Subsequently, in May of 2019, in the course of conducting additional investigation into Defendants' representations related to his investments, Dr. Moss discovered that he was never validly the named the beneficiary on the Transamerica, Policy #43828720, as Defendants promised on July 20, 2017 and subsequently.

192.     Later in May of 2019, in the course of conducting additional investigation into Defendants' representations related to he and his wife's investments, Mr. Kruglak discovered that neither he nor Mrs. Kruglak were ever validly named as beneficiaries on the Protective, Policy #PL0945569, as Defendants promised on October 12, 2016 and subsequently.

193.     Mr. Kruglak also discovered that Defendants never sought, and Protective never issued, the additional life insurance policy for $1,000,000.00 of coverage on Mr. Lien and Mrs. Lien, as Defendants promised the Kruglaks previously.

194.     On June 23, 2019, having received no response to his attempts to contact the Liens and recollecting Mr. Lien's instructions to contact Ms. Lien-Butler regarding his investments with Defendants and the distribution of equity and accrued income, Dr. Moss contacted Ms. Lien-Butler, leaving a detailed voicemail message, in which he advised her than he had serious concerns

about Mr. Lien's failure to respond and requesting her follow-up.

195.    Ms. Lien-Butler never responded to Dr. Moss's voicemail message on June 23, 2019, instead, on June 24, 2019, Mr. Lien responded regarding Dr. Moss's voicemail message to Ms. Lien-Butler from the prior day.

196.    In his call with Mr. Lien on June 24, 2019, Dr. Moss again explained than he had serious concerns about his investment accounts, including that he was not really named as beneficiary on the Transamerica, Policy #43828720, as Defendants represented and promised.

197.    On June 25, 2019, Mr. Lien contacted Dr. Moss and said that he had spoken with Transamerica, and that the company was sending new documents that would name Dr. Moss as a beneficiary.

198.    In the call with Dr. Moss on June 25, 2019, Mr. Lien assured him that, as soon as Defendants received the new documents from Transamerica, Defendants would sign and notarize the required portions and send them on to Dr. Moss.

199.    In response to numerous efforts by the Kruglaks to correspond with Defendants, Mr. Lien sent Mr. Kruglak an e-mail, dated July 8, 2019, in which Mr. Lien advised that scheduled transfers to the Trust's beneficiaries would be made on July 18 or 19, 2019.

200.    On July 29, 2019, after the passage of more than a month without any correspondence from Defendants, Dr. Moss sent an e-mail to Mr. Lien in which he requested Defendants provide him with the new documents from Transamerica, for Policy #43828720, showing that Dr. Moss is validly a beneficiary on the policy, by no later than August 2, 2019.

201.    In his July 29, 2019 e-mail, Dr. Moss again requested that Defendants send certain funds from his account in order to cover expenses and a statement showing the balances and the

positions of his investments, also by August 2, 2019.

202.    Defendants never responded to Dr. Moss's July 29, 2019 e-mail.

203.    On July 30, 2019, after the passage of several weeks without any correspondence from Defendants, Mr. Kruglak again sent an e-mail to Mr. Lien in which he requested Defendants provide him with confirmation of the wire transfers to the beneficiaries of the Trust, by August 2, 2019.

204.    In his July 30, 2019 e-mail, Mr. Kruglak also requested that Defendants send a statement showing the balances of the Kruglaks' and the Trust's investment funds and confirmation that he and Mrs. Kruglak are the beneficiaries of the life insurance policy with Protective, also by August 2, 2019.

205.    On August 1, 2019, Mr. Lien responded to Mr. Kruglak by e-mail and, rather than providing the requested documentation, instead indicated he should have "most of" the reports by August 3 or 4, 2019.

206.    In his August 1, 2019 e-mail, Mr. Lien requested that the Kruglaks pay "at least the premium for June" on the Protective, Policy #PL0945569, despite that Mr. Kruglak had previously discovered and communicated to Defendants that neither he nor Mrs. Kruglak were ever validly named as beneficiaries on the policy.

207.    Defendants never made the scheduled transfers to the beneficiaries of the Trust, as promised in Mr. Lien's July 8, 2019 e-mail.

208.    Defendants never provided the Kruglaks with any documentation, including as Mr. Lien promised in his August 1, 2019 e-mail.

209.    Defendants, in an effort to deflect suspicion and to maintain the appearance of

legitimacy, claimed to both Dr. Moss and the Kruglaks that it was an error by Protective and also by Transamerica that caused Plaintiffs to not be named as beneficiaries, as Defendants promised.

210.    No Plaintiff is now, or was ever, a beneficiary of any of Defendants' claimed life insurance policies with Protective and Transamerica, including the Protective Policy #PL0945569 and the Transamerica, Policy #43828720.

211.    Defendants, in an effort to maintain an air of legitimacy and continue to defraud Plaintiffs, have made numerous promises to provide Plaintiffs account statements, including by working with R.J. O'Brien to obtain them.

212.    Defendants have systematically failed to provide Plaintiffs with any substantive documentation since May of 2019, and none of Defendants' promises relating to account statements have materialized.

213.    Mr. Lien promised to come to Colorado to speak with Plaintiffs in person, purportedly to provide resolution as to the status of Plaintiff's investments-- even claiming to have booked an airline ticket and sending confirmation of the flight to Plaintiffs.

214.    However, Mr. Lien never came to Colorado as promised, and, upon further investigation, Plaintiffs learned that Mr. Lien actually cancelled his airline ticket shortly after providing Dr. Moss and the Kruglaks with confirmation of his intentions.

215.    On August 23, 2019, each Plaintiff, acting through counsel, sent a letter to Mr. Lien, Mrs. Lien, and Ms. Lien-Butler demanding the return of all of the funds currently invested with Defendants, including principal balances and accrued gains and interest, within five business days-- or by August 30, 2019.

216.    On August 26, 2019, Ms. Lien-Butler sent a letter to counsel for Plaintiffs, in which

she claimed not to know the Plaintiffs and further claimed that she was not affiliated with Westend Trading-- despite being designated as an agent in its contracts, having the ability to distribute funds on its behalf, and being designated as one of its contact persons.

217. On August 27, 2019, in response to Plaintiffs' letters demanding payment, Mrs. Lien sent a letter to counsel for Plaintiffs confirming receipt of Plaintiffs' letters, but claiming that she has never had any position or played any role in the management or conduct of Westend Trading and further claiming she never engaged with Plaintiffs in any business or professional capacity-- despite being designated as an agent in its contracts, having the authority to distribute funds on its behalf, and her execution of a beneficiary designation in favor of the Kruglaks, for a $1,500,000.00 life insurance policy on her life.

218. On August 27, 2019, and in response to Plaintiffs' letters demanding payment, Mr. Lien sent a letter to counsel for Plaintiffs confirming receipt of Plaintiffs' letters, in which he represented that neither his wife or his daughter had anything to do with his Westend Trading, despite its contracts naming both Mrs. Lien and Ms. Lien-Butler as agents with the power to distribute funds on its behalf.

219. In his August 27, 2019 response to Plaintiffs' letters demanding payment, Mr. Lien represented that "no outside individuals or investment specialists have played any part in my operations."

220. The foregoing statement is inconsistent with the statements made by Defendants to Plaintiffs on a variety of occasions, specifically, such a statement is inconsistent with prior statements from Mr. Lien regarding Brokers at R.J. O'Brien.

221. While Defendants acknowledged receipt of each Plaintiff's demand for payment,

in accordance with the terms of each respective Contract, none of the Defendants remitted any of the investment funds properly belonging to Plaintiffs.

222. To date, Plaintiffs' investments made with Defendants total approximately $2,032,831.00 in previously invested funds or principal, exclusive of any "profits" or growth, as follows:

    a. Dr. Moss's investments with Defendants, pursuant to the Moss Contract, less withdrawals, in the amount of $478,279.00;

    b. The Kruglaks' investments with Defendants, pursuant to the First Kruglak Contract, less withdrawals, in the amount of $885,000.00;

    c. The Kruglaks' investments with Defendants, pursuant to the Second Kruglak Contract, less withdrawals, in the amount of $650,000.00; and

    d. The Trust's investments with Defendants, less withdrawals, in the amount of $19,552.00.

## IV.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Securities Fraud / Violation of Colorado Securities Act and Aiding and Abetting Securities Fraud in Violation of C.R.S. § 11-51-501 and § 11-51-604**
*(Defendants, Douglas H. Lien, Camilla R. Lien and Westend Investments)*

223. Plaintiffs incorporate each and every allegation set forth above in their entirety, as if set forth herein.

224. Defendants received payment and consideration from Plaintiffs for the provision of advice and management as to the purchase and sale of securities, as contemplated by C.R.S. § 11-51-501(5).

225. In Colorado, C.R.S. § 11-51-201(17) provides, in pertinent part: "security means any...certificate of interest or participation in any profit-sharing agreement...investment

contract…"

226.    The investments, "equity," and "profits," along with the trading activities and investment contracts of the accounts allegedly managed by Defendants constitute securities as defined by C.R.S. § 11-51-201(17).

227.    Defendants, Mr. Lien and Westend Trading, engaged in a manipulative course of conduct and business over many years that operated as a fraud upon both existing and potential clients, including Plaintiffs, by misusing a network of social relationships to solicit and obtain discretionary authority over investment funds solicited from Plaintiffs and others and in exercising control over how the funds were used, based upon their communication of untrue information.

228.    Defendants, Mr. Lien and Westend Trading, in soliciting Plaintiffs' investments and inducing Plaintiffs to keep their investments with Defendants, knowingly misstated and failed to disclose facts, which were material under the circumstances in which the statements were made, including the representations made in Paragraphs 36 through 51, above, as to the investments, trading and strategy that the named Defendants would utilize, purportedly for Plaintiffs' benefit.

229.    The foregoing misrepresentations were made when Dr. Moss met with Mr. Lien, in-person, on or about October 13, 2011, and in the telephone call when Mr. Lien solicited the Kruglaks, on or about November 23, 2014, among others.

230.    Defendant, Mr. Lien, including while acting on behalf of and as an agent of Westend Trading, knowingly and with the intent to defraud, made untrue statements of material fact in soliciting and accepting money from Plaintiffs and regarding the status of Plaintiffs' investment accounts, including with respect to his experience, credentials and affiliations with other professionals, including with R.J. O'Brien, the activities associated with management of

Plaintiffs' investment accounts, the trading activities involving Plaintiffs' investment funds, the location of Plaintiffs' investment funds, why Plaintiffs' investment funds were not returned as requested, and by failing to disclose to Plaintiffs that Defendants had used client funds to pay other clients and otherwise misappropriating Plaintiffs' funds, in an effort to conceal Defendants' true activities involving investors' money.

231.    The foregoing misrepresentations were made between at least December 2011 and the present, when Plaintiffs were provided correspondences and issued account updates, periodic account statements and annual tax forms, all falsely demonstrating Plaintiffs were making profits.

232.    Defendants, Mr. Lien and Mrs. Lien, including while acting on behalf of and as agents of Westend Trading, knowingly and with the intent to defraud, represented to Plaintiffs that they completed and would file paperwork with certain life insurance companies to change the beneficiary designations to benefit Plaintiffs, in order to continue their fraudulent scheme and discourage Plaintiffs from taking steps to withdraw their investment funds.

233.    Defendants, Mr. Lien and Mrs. Lien, including while acting on behalf of and as agents of Westend Trading, knowingly and with the intent to defraud, made false representations regarding the security of Plaintiffs' investments, including by fraudulently claiming that Plaintiffs were named as beneficiaries on life insurance policies, including the representations as set forth in Paragraphs 53 through 55, above, when in fact the beneficiaries on the subject life insurance policies were others, in order to continue their fraudulent scheme and discourage Plaintiffs from taking steps to withdraw their investment funds.

234.    The foregoing misrepresentations were made, including in correspondences to the Kruglaks on March 27, 2016, September 6, 2016, and on October 12, 2016, and in correspondences

to Dr. Moss on April 19, 2016, June 23, 2016, September 12, 2016, and on July 20, 2017.

235.    While Mr. Lien and Westend Trading falsely represented to Plaintiffs that they were primarily investing in and short-term trading U.S. Government Treasury Bonds and futures contracts on those instruments, they have since represented, including in December 2018, in an effort to continue their fraudulent scheme and discourage Plaintiffs from taking steps to withdraw their investment funds, that the funds were in various inaccessible "longer term investments."

236.    Plaintiffs did not know that the statements variously made by Defendants, Mr. Lien and Mrs. Lien, including while acting on behalf of and as agents of Westend Trading, were either misleading or untrue, nor did they know that the named Defendants had withheld or otherwise failed to state material facts and, in the exercise of reasonable care, could not have known of such untruths, lies, and omissions and the time they were made.

237.    Had Plaintiffs been aware that the information communicated by Defendants, Mr. Lien and Mrs. Lien, including while acting on behalf of and as agents of Westend Trading, either misstated, lied about, or omitted material information, they would not have invested funds with Defendants, nor would they have maintained their investment funds in the accounts purportedly being managed by Defendants.

238.    As a direct and proximate result of Defendants, Mr. Lien and Mrs. Lien actions and failures to act, including while acting on behalf of and as agents of Westend Trading, and in operating in violation of the Colorado Securities Act, Plaintiffs have suffered damages in an amount to be proven at trial and the named Defendants are jointly and severally liable to Plaintiffs.

239.    As a member, agent, and representative of the Westend Trading general partnership, Defendant, Ms. Lien-Butler, is also responsible for any liability incurred by Westend

Trading, jointly and severally, as result of Mr. Lien's, Mrs. Lien's and Westend Trading's conduct on behalf of the partnership.

240.   Pursuant to C.R.S. § 11-51-604(3), Plaintiffs are entitled to recover their actual damages from Westend Trading and its members and partners, including from Defendants, Mr. Lien, Mrs. Lien and Ms. Lien-Butler, as well as interest, costs, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### Breach of Contract
*(Defendants, Douglas H. Lien, Camilla R. Lien, Lydia M. Lien and Westend Investments)*

241.   Plaintiffs incorporate each and every allegation set forth above in their entirety as if set forth herein.

242.   The Moss Contract, the First Kruglak Contract and the Second Kruglak Contract, along with any addendums or supplements, are valid written contracts between Defendants, Mr. Lien and Westend Trading, and the respective Plaintiffs.

243.   Plaintiffs complied with all of their obligations under the subject contracts.

244.   Defendants, Mr. Lien and Westend Trading, materially breached the terms of the subject contracts, including as modified by any addendums or supplements, by failing to, among other things: (a) engage in the agreed upon trading activities and investments for the benefit of Plaintiffs, as contemplated by the contracts; (b) properly designate Plaintiffs as beneficiaries of life insurance contracts, as contemplated and required by the terms of the contracts; (c) remit funds to Plaintiffs timely when requested or within five business days of Plaintiffs making the request, as required by the terms of the contracts; and (d) provide accurate statements of account, as required by the contracts.

245.   Defendants, Mrs. Lien and Westend Trading, materially breached the terms of the

subject contracts, including as modified by any addendums or supplements, by failing to, among other things: (a) remit funds to Plaintiffs when requested or within five business days of Plaintiffs making the request, as required by the terms of the contracts; and (b) properly designate Plaintiffs as beneficiaries to life insurance policies and instead retaining the designations for others.

246.    Defendants, Ms. Lien-Butler and Westend Trading, materially breached the terms of the subject contracts, including as modified by any addendums or supplements, by failing to, among other things, remit funds to Plaintiffs when requested or within five business days of Plaintiffs making the request, as required by the terms of the contracts.

247.    As a members, agents, and representatives of the Westend Trading general partnership, Defendants, Mrs. Lien and Ms. Lien-Butler, are also responsible for any liability incurred by Mr. Lien and Westend Trading, jointly and severally, as a result of Mr. Lien's and Westend Trading's conduct on behalf of the partnership.

248.    Plaintiffs have suffered, and continue to suffer, harm as a direct and proximate result of Defendants, Mr. Lien's, Mrs. Lien's, Ms. Lien-Butler's and Westend Trading's material breaches of the Contracts.

249.    As a result of the named Defendants' breaches, as described herein, Plaintiffs have suffered economic damages and losses.

250.    Plaintiffs are entitled to be compensated for their damages and losses, as a result of Defendants' breaches of the subject contracts.  Such damages include loss of principal, lost profits and earnings, lost income, and any other damages caused by the named Defendants' breaches of the contracts, in an amount to be determined at trial, but not less than $2,032,831.00.

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty**

(*Defendants, Douglas H. Lien and Westend Investments*)

251.   Plaintiffs incorporate each and every allegation set forth above in their entirety as if set forth herein.

252.   Through the course of their relationship with Plaintiffs, Defendants, Mr. Lien and Westend Trading, were entrusted to act for the benefit and in the best interests of Plaintiffs, and had the legal obligation to do so by virtue of the special relationship with Plaintiffs, their control over Plaintiffs' funds, and their authority as to how those funds were invested and distributed.

253.   Plaintiffs and Defendants, Mr. Lien and Westend Trading, entered into a special relationship of trust and confidence whereby the Plaintiffs reasonably relied upon these Defendants, due to their contractual position of control and special relationship based upon these parties' claimed experience and expertise in investments and trading activities.

254.   Plaintiffs acted reasonably in placing their trust and confidence in the named Defendants.

255.   The named Defendants breached their fiduciary duties to Plaintiffs by: (a) concealing the true use of Plaintiffs' investment funds; (b) converting, misusing, and absconding with Plaintiffs' investment funds to the detriment of Plaintiffs; (c) purportedly placing Plaintiffs' investment funds in unauthorized "longer term investments," which would render the funds inaccessible, inconsistent with the representations made regarding Defendants' claimed investment activities; and (d) failing to provide Plaintiffs' investment funds when requested.

256.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs have suffered damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Civil Theft Pursuant to C.R.S. § 18-4-405**

*(Defendants, Douglas H. Lien, Camilla R. Lien, Lydia M. Lien and Westend Investments)*

257.    Plaintiffs incorporate each and every allegation set forth above in their entirety as if set forth herein.

258.    Plaintiffs are the rightful owners of their investment funds provided to Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, for investment.

259.    Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, never accounted to Plaintiffs for the still outstanding investment funds, still held by the named Defendants, in the principal amounts totaling approximately $2,032,831.00, exclusive of "profits" or growth and other damages.

260.    Upon information and belief, the funds placed with Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, by Plaintiffs for investment and trading by Defendants, were improperly diverted by Defendants and for Defendants' own use, for reasons other than the agreed upon and stated goals for Plaintiffs' investment funds.

261.    Upon information and belief, Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, unlawfully diverted funds that rightfully belong to Plaintiffs to pay other obligations, including obligations to other clients of Defendants' investment advisory business.

262.    As such, Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, knowingly obtained, retained, and exercised control over the funds of Plaintiffs by deception with the intent to permanently deprive Plaintiffs of the use and benefit of the funds.

263.    Defendants, Mr. Lien's, Mrs. Lien's, Ms. Lien-Butler's and Westend Trading's, conduct relating to these funds constitutes civil theft in violation of C.R.S. § 18-4-401.

264.    As a direct and proximate result of Defendants, Mr. Lien's, Mrs. Lien's, Ms. Lien-

Butler's and Westend Trading's, theft of these funds, Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than $2,032,831.00.

265.     Plaintiffs are entitled to the return of the subject funds, as well as an award of treble damages, costs and attorneys' fees, as a result of Defendants' civil theft under C.R.S. § 18-4-405.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy
*(Defendants, Douglas H. Lien, Camilla R. Lien, Lydia M. Lien and Westend Investments)*

266.     Plaintiffs incorporate each and every allegation set forth above in their entirety as if set forth herein.

267.     Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, agreed and participated in a scheme to develop relationships with, and ultimately to defraud, Plaintiffs and other clients of Defendants' investment advisory business, through the purported sale of investments and management of accounts by Defendants, purportedly for the benefit of Plaintiffs and others.

268.     Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, agreed, through words or conduct to accomplish this unlawful goal through the use of unlawful means such as fraud and misrepresentation, in violation of the Contracts as well as violations of the Colorado Securities Act as detailed fully in this complaint.

269.     Defendants, Mr. Lien, Mrs. Lien, Ms. Lien-Butler and Westend Trading, committed numerous fraudulent acts in furtherance of their scheme including, but not limited to, fraudulently representing to Plaintiffs the true status of their investments with Defendants, the true status of their interests in life insurance policies, and through numerous violations of the Colorado Securities Act.

270.    Plaintiffs have suffered damages caused by the unlawful conspiracy and caused by the unlawful conduct of Defendants used to accomplish their unlawful goals.

271.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

## V.    DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, Douglas H. Lien, Camilla R. Lien, Lydia M. Lien and Lien Westend Investments, upon each and every claim relief asserted herein, and including without limitation:

a.    A money judgment for all economic loss to make Plaintiffs whole from and against all claims and breaches of duties owed by Defendants to Plaintiffs, and rendering Defendants liable jointly and severally with each other and with the others with whom they have conspired or acted in concert;

b.    A money judgment against Defendants, jointly and severally, for all economic loss required to make Plaintiffs whole from and against all wrongful acts and failures to act by Defendants;

c.    Pre and post judgment statutory interest as provided by in C.R.S. § 5-12-101 and any other applicable authority;

d.    Reasonable attorneys' fees, expert witness fees, and other fees and costs, including any costs of collection, including as provided by statute;

e.    Exemplary damages, as deemed appropriate;

f.    Treble damages and attorneys' fees at the trial and appellate level as provided by C.R.S. § 18-4-405 and C.R.S. § 18-17-106;

g.      An Order for each Defendant to account for and for any benefitted party (including

both Defendants and third-parties) to disgorge all funds improperly obtained from

Plaintiffs; and

h.      Such other and further relief as the Court may deem just and proper.

**PLAINTIFFS DEMAND A TRIAL TO A JURY OF ALL ISSUES SO TRIABLE.**

Respectfully submitted this 11th day of December, 2019.

By:     */s/ James N. Thomaidis*
         James N. Thomaidis, Attorney Reg. #38836

         GERSH & THOMAIDIS, LLC
         1860 Blake Street, Suite 610
         Denver CO 80202-1263
         Telephone:  303.293.2333
         jt@gtattorneys.com

         *Attorneys for Plaintiffs, Richard M. Moss,*
         *Ivan T. Kruglak, Ann S. Kruglak, and The*
         *Natacha Kruglak Trust.*